# **EXHIBIT B**

CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV12782972 | D1 CM | 19426356 |

Rule 4 (B) Ohio

Rules of Civil Procedure

| | |
|---|---|
| JACQUES C. POMEROY, ET AL | **PLAINTIFF** |
| VS | |
| LINCOLN NATIONAL CORPORATION | **DEFENDANT** |

# SUMMONS

LINCOLN NATIONAL CORPORATION
DBA LINCOLN FINANCIAL GROUP (FKA
LINCOLN LIFE INSURANCE COMPANY, FKA
JEFFERSON PILOT LIFE INSURANCE
COMPANY)
150 NORTH RADNOR-CHESTER ROAD
RADNOR PA 19087-0000

You have been named defendant in a complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)



Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

**Plaintiff's Attorney**

TIMOTHY P WHITFORD
1991 CROCKER ROAD

SUITE 550
WESTLAKE, OH 44145-0000

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

**Case has been assigned to Judge:**

STUART A FRIEDMAN
**Do not contact judge. Judge's name is given for attorney's reference only.**

GERALD E. FUERST
Clerk of the Court of Common Pleas

| DATE |
|---|
| May 23, 2012 |

By _____ Deputy

COMPLAINT FILED 05/18/2012

*Received*
*6/7/12*
*in Radnon PA*

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | |
|---|---|
| **JACQUES C. POMEROY**<br>6880 Dawson Road<br>Cincinnati, Ohio 45243 | **CASE NO.** |
| And | Judge:  STUART A FRIEDMAN |
| **JP AGENCY, INC. (dba POMEROY FINANCIAL SERVICES)**<br>6880 Dawson Road<br>Cincinnati, Ohio 45243 | CV 12 782972 |
| Plaintiffs, | |
| vs. | |
| **LINCOLN NATIONAL CORPORATION dba LINCOLN FINANCIAL GROUP (fka LINCOLN LIFE INSURANCE COMPANY, fka JEFFERSON PILOT LIFE INSURANCE COMPANY)**<br>150 North Radnor-Chester Road<br>Radnor, PA 19087 | **COMPLAINT**<br><br>**(Trial by Jury Demanded)** |
| Defendant. | |

Now come Jacques C. Pomeroy and JP Agency, Inc., doing business as Pomeroy Financial Services (collectively "Plaintiffs"), by and through their undersigned counsel, and for their Complaint against Lincoln Life Insurance Company ("Defendant"), formerly known as Jefferson Pilot Life Insurance Company, state as follows:

## PARTIES AND JURISDICTION

1. Plaintiff Jacques C. Pomeroy is an individual who is a citizen and resident of the State of Ohio, and who is the principal of Plaintiff JP Agency, Inc.

2. Plaintiff JP Agency, Inc. is an insurance agency and a corporation organized under the laws of the State of Ohio, having its principal place of business in Cincinnati, Ohio.

3. Defendant Lincoln Life Insurance Company is believed to be a corporation organized under the laws of the State of Indiana, having a principal place of business in Philadelphia, Pennsylvania.

4. Plaintiffs' claim for relief against Defendant arose out of activity taking place in Cuyahoga County, Ohio.

5. Defendant regularly solicits business in the State of Ohio.

6. Venue is proper before this honorable Court pursuant to Civ. R. 3(B)(3) and (6) of the Ohio Rules of Civil Procedure.

7. Jurisdiction is proper under R.C. 2307.382(a)(1-4), (6) and (9)

## FACTS

8. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1-7 as if fully rewritten herein.

9. Plaintiffs and Defendant were parties to a written contract whereby Plaintiffs sold life insurance policies and services underwritten by Defendant.  A copy of the parties' contract is attached hereto and incorporated herein by reference as Exhibit A.

2

10. Defendant supplied Plaintiff with applications, tools, and illustrations in order for Plaintiffs to sell life insurance policies and services on behalf of Defendant.

11. The applications, tools, and illustrations provided by Defendant were to be used by Plaintiffs to demonstrate how a given life insurance policy was to function, including, among other things, interest payments, mortality payout, and charges for administering the given life insurance policy.

12. Plaintiffs serviced these life insurance policies along with and under the direction and control of Defendant.

13. Plaintiffs were recognized for being the leading producers for Jefferson Pilot in the country for at least two (2) years.

14. As mandated by Defendant, Plaintiff was required to use the applications, tools, and illustrations provided by Defendant.

15. Plaintiffs had no discretion or ability to change the applications, tools, and illustrations provided by Defendant, nor did Plaintiff have any role in creating them.

16. Over the course of the parties' relationship, Defendant delivered multiple life insurance policies to Plaintiffs, including delivering policies to Plaintiffs and insureds in Cuyahoga County, Ohio.

17. One of the purchasers/recipients of the policies was the Eleanor Schwartz Trust ("Schwartz Trust"), which included one policy worth approximately $5.25 million and the other approximately $20 million, both of which insured the life of Eleanor Schwartz.

18. The illustrations for the two Schwartz policies provided by Defendant were faulty and contained a number of misrepresentations, false statements, and errors.

19. Specifically, the illustrations contained incorrect premium terms as a result of an error by Defendant.

20. There is no evidence that the Plaintiffs did anything other than transmit the illustrations to the Schwartz Trust.

21. As a result of these wrongful illustrations, the Schwartz Trust sued Plaintiffs and Defendant as co-defendants on July 19, 2007 in the Cuyahoga County Court of Common Pleas, Case Number CV-07-630365.

22. A jury trial commenced on May 18, 2011 and resulted in a verdict against the Schwartz Trust and in favor of Plaintiffs, finding that, among other things, Plaintiffs had no liability to the Schwartz Trust.

23. Just prior to the commencement of trial in May 2011, counsel for the Schwartz Trust, Defendant, and Plaintiffs met in Greensboro, North Carolina for a settlement meeting.

24. Counsel for the Schwartz Trust and Defendant left counsel for Plaintiffs waiting in a conference room in Greensboro while they secretly negotiated a settlement, without including Plaintiffs in the discussions.

25. While counsel for Plaintiffs was waiting for a number of hours in North Carolina without notification from either the Schwartz Trust counsel or Defendant's counsel, the Schwartz Trust and Defendant agreed to a settlement of the case, through which Defendant attempted to saddle Plaintiffs with liability for Defendant's misdeeds.

4

26. As part of this settlement, Defendant went so far as to agree to cooperate with the Schwartz Trust against Plaintiffs.

27. Defendant, the party solely responsible for providing the wrongful information that resulted in the Schwartz dispute, was now using its own misrepresentations and fraudulent statements against Plaintiffs.

28. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs incurred undue burden, expenses, fees, and other costs as a result of having to defend against the lawsuit brought against Plaintiffs and Defendant in Cleveland.

29. In addition, Plaintiffs suffered severe damage to their business as a result of having to defend itself in the lawsuit in Cleveland.

30. As part of its compensation arrangement through policies sold, Plaintiffs would receive profit from premium payments for services and policies provided to Defendant's clients.

31. The secret settlement agreement between Defendant and the Schwartz Trust called for a "premium holiday" whereby Plaintiffs would not receive its profit from premiums on the Schwartz Trust policies, despite the fact that Plaintiffs performed all obligations incumbent upon them to receive said distributions.

32. For example, as a result of Defendant's wrongful actions, Plaintiffs lost out on 3% of additional funds for ten years, totaling approximately $13,130.

33. In addition, Plaintiffs incurred out of pocket expenses, lost profits and business opportunities, and other damages stemming from the wrongful conduct of Defendant.

34. But for Defendant's actions in creating the circumstances that led to the Schwartz Trust litigation and the secret settlement reached which forced Plaintiffs to defend alone the misfeasance and malfeasance of Defendant, Plaintiffs would not have been put in the damaging position they experienced.

35. Even though Plaintiffs ultimately prevailed at trial, they suffered severe damage which was directly and/or proximately caused by Defendant.

## COUNT I
## (NEGLIGENCE)

36. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1-35 as if fully rewritten herein.

37. Defendant owed Plaintiffs a duty to act with ordinary reasonable care.

38. For example, Defendant breached its duty when it settled the Schwartz case on the eve of trial without notifying Plaintiffs, and agreeing to work against Plaintiffs, its contracted insurance agent.

39. In addition, Defendant breached its duty when it provided Plaintiffs with applications, tools, and illustrations which contained false and inaccurate information which was ultimately used by Plaintiffs without warning or correction by Defendant.

40. It was foreseeable that Plaintiffs would suffer damages as a result of Defendant's negligent conduct.

41. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered and will continue to suffer severe damage.

## COUNT II
## (BREACH OF FIDUCIARY DUTY)

42. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1-41 as if fully rewritten herein.

43. While the contract between the parties defined the relationship as an independent contractor relationship, the conduct exerted by Defendant as well as the lack of discretion Plaintiffs had indicate the relationship was an agency relationship.

44. As the principal in the agency relationship, Defendant owed Plaintiffs fiduciary duties to act in the best interests of Plaintiffs.

45. Defendant owed Plaintiffs, as part of its fiduciary duties, a full duty of disclosure and to refrain from acting in a way that was likely to cause damage to Plaintiffs.

46. Defendant breached those fiduciary duties to Plaintiffs by, among other things, secretly settling the Schwartz Trust litigation and concealing it from Plaintiffs, leaving Plaintiffs to defend itself alone against acts committed by and at the direction of Defendant.

47. Plaintiffs have suffered and will continue to suffer severe damage as a result of Defendant's breach of fiduciary duties.

## COUNT III
## (BAD FAITH)

48. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1-47 as if fully rewritten herein.

49. Based upon the parties' relationship, Defendant owed Plaintiffs a duty to act in good faith.

7

50. Defendant breached its duty to act in good faith when, among other things, it created the circumstances leading to the Schwartz Trust litigation and then secretly attempted to pass its liability onto Plaintiffs, and when it engaged in behavior that was likely to damage Plaintiffs' business and reputation.

51. Defendant engaged in bad faith by agreeing to cooperate against Plaintiffs.

52. As a result of Defendant's breach, Plaintiffs have suffered and will continue to suffer severe damage.

53. Defendant's conduct was willful, malicious, oppressive, and in bad faith, entitling Plaintiffs to its expenses of litigation, including attorneys' fees.

54. Defendant's conduct showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences. Plaintiffs are therefore entitled to an award of punitive damages.

## COUNT IV
## (BREACH OF CONTRACT)

55. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1-54 as if fully rewritten herein.

56. A written contract existed between Plaintiffs and Defendant whereby Plaintiffs would sell life insurance policies and provide life insurance services to insureds.

57. Plaintiffs fulfilled each of their obligations under the contract and have fulfilled all duties incumbent upon them under the parties' contract.

58. Defendant has materially breached the contract by, among other things, providing faulty applications, tools, and illustrations to Plaintiffs and by failing to provide

8

Plaintiffs with materials which contained accurate and truthful information to distribute to potential policyholders.

59. As a direct result of Defendant's breach, Plaintiffs have suffered, and will continue to suffer severe damages.

## COUNT V
## (FRAUD AND MISREPRESENTATION)

60. Plaintiffs incorporate by reference all of the allegations contained in Paragraphs 1-59 as if fully rewritten herein.

61. Defendant made numerous statements and representations which were false when made, proven (or should have been proven) to be false at the time, and were made with the purpose of misleading Plaintiffs and its policyholders, and inducing them to rely to their detriment on said statements and representations.

62. For example, Defendant printed and published false and misleading information which it knew Plaintiffs would rely upon in making sales of insurance policies, as was the case in the Schwartz Trust litigation.

63. In fact, Defendant insisted that Plaintiffs use only the materials provided by Defendant, which ultimately contained the false statements and representations.

64. These false statements and misrepresentations served as the basis for the Schwartz Trust litigation against Plaintiffs.

65. Defendant perpetuated the fraud even further by secretly settling the Schwartz Trust litigation without Plaintiffs, thereby attempting to pass its own misdeeds onto Plaintiffs.

9

66. As part of that secret settlement, Defendant has attempted to deprive Plaintiffs of the fees and commissions due Plaintiffs for its work in the Schwartz Trust sales, without the approval or agreement of Plaintiffs.

67. Defendant's wrongful actions, fraud, and intentional/negligent misrepresentations have caused and will continue to cause significant damage to Plaintiffs.

68. Defendant's conduct was willful, malicious, oppressive, and in bad faith, entitling Plaintiffs to its expenses of litigation, including attorneys' fees.

69. Defendant's conduct showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, which would raise the presumption of conscious indifference to consequences. Plaintiffs are therefore entitled to an award of punitive damages.

**WHEREFORE**, Plaintiffs pray for judgment against Defendant as follows:

a. Compensatory damages in the types and amounts proved at trial, but at least in excess of $25,000.00.

b. Punitive damages in the amount of at least $1,000,000.00.

c. Prejudgment and post-judgment interest;

d. Plaintiffs' costs and expenses of litigation, including attorneys' fees and expert fees;

e. Costs of this action; and

f. Such other and further relief, legal and equitable, as this Court shall deem just and appropriate.

Respectfully submitted,

TIMOTHY P. WHITFORD (0059954)
WALDHEGER • COYNE
A Legal Professional Association
1991 Crocker Road, Suite 550
Westlake, Ohio  44145
Phone (440) 835-0600
Fax:  (440) 835-1511

Attorney for Plaintiffs

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all claims so triable.

Respectfully submitted,

TIMOTHY P. WHITFORD (0059954)
WALDHEGER • COYNE
A Legal Professional Association
1991 Crocker Road, Suite 550
Westlake, Ohio  44145
Phone (440) 835-0600
Fax:  (440) 835-1511

Attorney for Plaintiffs

05/31/2005  13:00  7703987511      JP FINANCIAL ATL      PAGE  06/11
May 31.05 09:54a   Jacques C Pomeroy      1-828-694-1339      p.6

# JEFFERSON PILOT FINANCIAL

## AGENT CONTRACT

This contract between Jefferson-Pilot Life Insurance Company and Jefferson Pilot Financial Insurance Company on behalf of themselves and any subsequent affiliate designated from time to time by notice (hereinafter collectively referred to as the "Company" "we", "our" or "us") and

**JACQUES C POMEROY**

(hereinafter referred to as "you", "your" or "yours") is subject to the following terms and conditions:

**Expectation.** We expect quality life insurance and annuity business with excellent persistency from you and any persons or organizations recruited by or assigned to you ("Agents"). This can be achieved by soliciting business in a professional and ethical manner, by providing customers with an assessment of the need for our products and by timely servicing policyowners. You expect us to provide you with competitive products, marketing support, and responsive and timely service.

**Classification**
You are initially classified as a(n)

**AGENT  EGA**

The Company may reclassify you from time to time. You will be notified of any such reclassification prior to the effective date of the new classification. Any change to a different level would be typically based on announced or required production levels, but may also be based on other considerations such as changes in field management or organization, or changes in marketing strategy. The new classification will apply to business produced after the effective date of your reclassification.

**Authority**
(a) **Appointment.** We hereby authorize you:
(1) to solicit, after being properly licensed under state law and appointed under existing Company Guidelines, applications for life insurance and annuity policies on behalf of the Company using terms, rates and guidelines provided by the Company;
(2) to promptly deliver policies when the conditions governing such delivery have been met;
(3) to collect the initial modal premium necessary to place in force or to reinstate a policy in the form of a check payable to the Company;
(4) to service the policyowner;
(5) to recruit, and recommend the appointment to us, persons and organizations meeting the Company's standards for holding an Agent Contract if authorized by the terms of your Agent Compensation Plan.

(b) **Company Independence.** Each life insurance company's products are separately underwritten and are the sole obligation of the issuing insurer. The life companies are members of Jefferson Pilot Financial. Jefferson Pilot Financial is the

marketing name for Jefferson Pilot Corporation and its subsidiaries. Jefferson Pilot Corporation is not responsible for financial obligations of these corporations.

(c) **Relationship with Company.** You are an independent contractor and not an employee of the Company.

(d) **Relationship with Agents.** Our relationship with Agents will be set forth in written contracts between the Company and the respective Agent, and shall not become effective until we sign a written contract with the Agent and the Agent is properly appointed. You shall have no authority to modify any such contracts. We may refuse to contract any proposed Agent.

(e) **Responsibility.** You agree to abide by the terms and conditions of this contract, your Agent Compensation Plan, the Market Conduct Manual, and any rules relating to our business as may be published, or contained on our Web site, from time to time.

(f) **Limitation of Authority.** Your authority shall extend no further than as stated in this contract. You shall not:
(1) make, waive, or change any questions, statements, or answers on any application for an Agent Contract, the contract itself or any application for insurance, the terms of any receipt given thereon, or the terms of any policy or contract;
(2) extend or waive any provision of any policy or the time for payment of premiums;
(3) deliver any policy unless the health of the insured(s) or annuitant is substantially unchanged from the date of the application (not applicable if premium is paid with the application);
(4) incur any debts or liability for or against us;
(5) receive any money for us except premiums as authorized in section (a) (3) above, in the form of a check payable to the Company;
(6) misrepresent, or fail to disclose accurately, the terms or nature of the Company's products;
(7) pay any premiums on policies other than your own, your immediate family members, or for which you are a fiduciary;
(8) solicit business in a state where the policy is not approved for sale;
(9) share any part of your management compensation with an Agent recruited by or assigned to you;
(10) violate any published Company policy on viatical sales.

(g) **No Rebating.** You shall not, whether or not permitted by law, pay or allow any rebate of premiums or commissions in any manner, directly or indirectly.

(h) **Sales Promotion.** No advertising or sales material referencing our products or Company may be used without our prior written consent (see our Advertising and Marketing Compliance Guidelines). While Company stationery may be made available to you, it is to be used only when promoting our products exclusively.

Page 1 of 4
5/02

R102300


EXHIBIT
A

(i) **Errors and Omissions Coverage.** You shall obtain and maintain a professional errors and omissions liability policy with minimum limits as published from time to time by the Company. To the extent not covered by liability insurance, you shall hold harmless and indemnify the Company, its subsidiaries and affiliates, from any and all expenses, costs, causes of action, penalties and damages resulting from or growing out of:

 (1) Acts or omissions by you or your employees that result in a loss to us.

 (2) Claims made by any of your Agents for compensation over and above that which is specifically agreed upon in such Agent's Contract.

(j) **Compliance.** You shall abide by all applicable local, state and federal laws and regulations in conducting business under this contract. You also agree to promptly report to the Company's Home Office any and all customer or regulatory complaints of which you have knowledge.

(k) **Books and Records.** You shall maintain, and we shall have the right to inspect and audit, all records and documents relating to the business of the Company conducted by you, your employees, or Agents assigned to you. This provision shall survive any termination of this contract.

(l) **Territory.** This contract does not confer any exclusive right or territory upon you and the Company reserves the right:

 (1) To appoint additional individuals or organizations which hold an Agent Contract in such locale who also shall have the right to recommend appointment of Agents by the Company;

 (2) To establish and maintain other or additional offices in the same locale; and

 (3) To appoint Agents in such locale as recommended by others.

**Compensation**

An adequate level of production and excellent persistency of business are the cornerstones of this contract.

(a) You shall be compensated in accordance with the terms of this contract and the Agent Compensation Plan for your classification.

(b) No commissions will be payable on account of waived premiums, interest collected, or premiums refunded for any reason, and you shall repay to us any compensation paid on account of any such premium or interest.

(c) Compensation on premiums paid in advance on the policies with required periodic premiums will not be payable until the regular due date of such premium.

(d) Compensation on extra premiums, conversions, exchanges, replacements and other special situations not provided herein will be governed by our rules and practices in effect at that time.

(e) The rate of and the right to receive Compensation on any policy not listed in the Schedule of Commissions or requiring special underwriting shall be determined by the published Schedule of Commissions for that product or rules of the Company in effect at that time, or by a separate written agreement with you signed by a Vice President of the Company.

(f) No applications will be accepted nor will any compensation be paid on policies which are not approved in the state where written.

(g) We reserve the right to reject any applications submitted under this contract.

(h) The Company may in its discretion settle any claim of applicants, policyowners or others in connection with any consumer complaint or any threatened or pending lawsuit as a result of any claimed improper or unauthorized action or statement in marketing the policy. Any compensation change back shall be made in accordance with then Company policy.

(i) In order to receive any compensation you must be licensed and appointed with us in the policy's state of issue at the time of policy issue.

**Change or Termination**

(a) **Changes.** We may at any time and from time to time:

 (1) change or modify this contract;

 (2) modify or amend any policy form;

 (3) fix minimum and maximum limits on the amount for which any policy form may be issued;

 (4) modify or alter the conditions or terms under which any policy forms may be sold;

 (5) discontinue or withdraw any policy from any state, without prejudice to continue such form elsewhere;

 (6) cease doing business in any state; or

 (7) change the Schedule of Commissions or the commissions on any or all of our policy forms, but any such change shall apply only to policies which shall be issued on or after the effective date of the change.

(b) **Voluntary Termination.** This is an at-will contract; this is not a contract for a definite term or period of time. By notice, either of the parties hereto may terminate this contract, without stating any cause, by depositing written notice of termination in regular U.S. mail addressed to the last known address of the other party.

(c) **Automatic Termination.** This contract automatically terminates upon:

 (1) your death or inability to perform your responsibilities under this contract or as contained in your Agent Compensation Plan;

 (2) your insolvency or bankruptcy occurring after the date of this contract, or if you are a corporation, upon your dissolution or liquidation;

 (3) your failure to meet the minimum production requirements of the Company for continuation of this contract. These requirements may change from time to time. The minimum requirements shall be announced annually and any changes shall be announced prior to the effective date of change;

 (4) failing to maintain in force specified amounts of a professional errors and omissions liability policy

(d) **Termination For Cause.** Results in forfeiture of any further payments and any accrued rights to participate in plans, programs, or benefits which require an active Agent Contract. Termination for cause shall be:

 (1) material violation of any of the provisions of this contract or published Company policy relating to Agent conduct;

 (2) material violation of any state or federal laws or regulations relating to insurance;

(3) inducing or attempting to induce our policyowners to
relinquish or replace our policies with such frequency
as to indicate a pattern of inappropriate activity;

(4) misappropriation or commingling of our funds; or

(5) engaging in a fraudulent act or misrepresenting policy
benefits, provisions, or premiums.

A termination under either Section (c) or Section (d) immediately
above will not preclude a termination under this section at a
later date.

**(e) Compensation Payable After Termination.**

(1) Vesting of compensation shall be as described in the
Agent Compensation Plan for your classification.

(2) If this contract is terminated due to your death, any
compensation which otherwise would have been paid
to you shall be paid to your surviving spouse, and at
the death of the surviving spouse, to the spouse's
estate. If you leave no surviving spouse, then your
compensation shall be paid to your estate. You may
designate another payment arrangement on forms
provided by us and signed by you.

(3) If you are a partnership or corporation and this contract
is terminated due to your termination or dissolution,
compensation shall be paid to the licensed agent who
signed the application for the policy. You may designate
another payment arrangement on forms provided by
us and signed by you.

(4) Notwithstanding the foregoing, if at any time you are
notified this contract is terminated for cause no further
compensation will be paid.

**(f) Indebtedness.** Termination will not dismiss or reduce any
indebtedness you owe the Company, its subsidiaries or affiliates.

**(g) Company Property.** All Company supplied material,
including but not limited to, manuals, forms, supplies, sales
brochures, software, or lists of policy owners or insured persons
shall be and remain the property of the Company shall not
be shared with, or made known to, any third party without the
written consent of the Company. Upon termination of this
contract for any reason, you agree:

(1) to assemble and deliver promptly to the Company all
such material (including copies) whether such be in
hard copy form or otherwise; and

(2) not to use any such material for your commercial
purposes or for that of any other entity.

**General Provisions**

**(a) Accounts.** We agree to keep an accurate account of all
business produced by you and your Agents, and will periodically
render to you an itemized statement of said business. You
agree to examine said statement immediately and to notify us
at once, in writing, of any difference between said statement
and personal records. We reserve the right to periodically audit
and correct records and compensation to preserve accuracy.

**(b) Agent Compensation Plan.** We will establish, maintain, and
publish an Agent Compensation Plan for each classification of
Agent. Each such Plan may be amended from time to time at
our sole discretion. The terms and conditions of the Agent
Compensation Plan that are for your current classification are
made a part of this contract by reference.

**(c) Arbitration.** All claims or controversies arising out of or
relating to this contract shall be settled by arbitration. This
paragraph provides the exclusive remedy for any dispute that
may arise between you and us (but does not necessarily apply
to any third party litigation that may involve you and/or us )
which the parties are not able to resolve in good faith. In the
event of any unresolved dispute relating to this contract, including
but not limited to a dispute about the interpretation of this
contract or about your claim to compensation, either party may
demand arbitration, by giving written notice to the other party.
The party initiating the arbitration ("Claimant") shall give written
demand ("Demand") to the other party ("Respondent"), by
certified or registered mail, return receipt requested. Any notice
given under this provision to you shall be at your last known
address and to us shall be to the General Counsel at our Home
Office. The parties agree that the Commercial Arbitration Rules
of the American Arbitration Association in effect at the time of
the Demand shall apply to the arbitration procedure, including
the selection of a panel of three arbitrators. The arbitrators
shall have the authority to determine all disputes, including the
applicability of arbitration to the dispute. The award in writing
shall be made within sixty (60) days after the appointment of
the third arbitrator. The arbitrators may award compensatory
damages, plus interest, and specific performance. The award
of the arbitration panel shall be final and binding on all parties.
Judgement upon the award may be entered in any court having
jurisdiction. No demand for arbitration under this section, and
no claim under this contract, may be made after the date when
such dispute would be barred by the applicable statute of
limitations. Each party shall bear its own costs and expenses.
Any arbitration arising between the parties with respect to
this contract shall be conducted in Greensboro, NC, or in
Concord, NH.

**(d) Assignment.** Neither this contract nor any of the benefits
thereof may be assigned or transferred without our prior written
consent. Any approved assignments shall be subject to a first
lien to us for any indebtedness owed to us.

**(e) Indebtedness.** Any advance, annualization of compensation
or charge back from us to you shall constitute a general
indebtedness of yours to us. Your indebtedness is a first lien
against any compensation due hereunder, and we may offset,
at any time, your indebtedness to the Company, its subsidiaries
or affiliates.

**(f) Non-Waiver.** Failure of the Company to require strict
compliance with any of the terms or conditions of this contract
shall not constitute a waiver of such terms or conditions nor
affect the right of the Company thereafter to require such
compliance.

**(g) Partnerships.** When you are a partnership or corporation,
any reference made to you as an individual shall be deemed to
mean the partners or the officers of the corporation who are
licensed and appointed with us.

**(h) Prior Contracts.** This contract shall supercede any and all
prior contract(s) between you and us, however, any outstanding
indebtedness shall survive.

BH-02300

(i) **Service of Process.** You are not our authorized Agent or representative to accept service of legal process, and therefore, you should not accept service. If, however, any paper is served upon you, you shall fax or send by certified mail the same to our General Counsel at our Home Office by certified mail within 24 hours after receipt.

This contract shall take effect on the date shown below after the same has been signed by a Vice President of the Company and provided you have satisfied the licensing requirements of the state(s) where you propose to market our products.

**Governing Law**
This contract shall be governed by the laws of the State of North Carolina.

**Entire Contract**
The foregoing represents the entire contract between the parties and we shall not be bound by any other promise, contract, understanding or representation unless it is made by an instrument in writing, signed by a Vice President of the Company.

**Agent**

JACQUES C. POMEROY
Print name

Signed

5-31-05
Date Executed

[check appropriate line and complete]

[X] Individual SSN# 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

[ ] Partnership Tax ID# _____

[ ] Corporate Tax ID# _____

**Home Office Approval**
This contract is approved and shall become effective as of June 1 20 05 , but notwithstanding such effective date, if you are properly licensed and permitted by law in the state of operation, you are authorized to submit applications for insurance which shall be governed by the provisions of this contract.

**Jefferson Pilot Life Insurance Company**
**Jefferson Pilot Financial Insurance Company**

By

Executive Vice President
Title

6/1/05
Date Executed

 **JEFFERSON PILOT SECURITIES**    Jefferson Pilot Securities Corporation, PO Box 2005, Concord, NH 03302-2005

## JEFFERSON PILOT SECURITIES CORPORATION
## REGISTERED REPRESENTATIVE AGREEMENT

Jefferson Pilot Securities Corporation, One Granite Place, PO Box 2005, Concord, NH 03302-2005

This Agreement made this 6th day of September 2002 by and between JACQUES C. HONEYCUT (hereinafter referred to as the Registered Representative) and Jefferson Pilot Securities Corporation (hereinafter referred to as the Company).

### 1. Authorization

The Company, subject to the terms and conditions contained herein, hereby authorizes the Registered Representative, as an independent contractor, to solicit and receive orders for the purchase and sale of securities through the Company.

Nothing in this Agreement or elsewhere shall be construed to authorize the Registered Representative to incur any expense, debt, or liability in the Company's name. The Registered Representative may not bind the Company by any statement, promise, representation, agreement or contract of any kind, or waive any of the Company's rights.

Other than in the course of conducting securities business pursuant to this Agreement, or in the course of providing other services through an affiliate of the Company for which the Registered Representative is fully licensed, the Registered Representative will not directly or indirectly represent an affiliation with the Company in providing any other services or products or while engaging in any Outside Business Activity (as defined below), including, but not limited to, tax, accounting, and legal services. The Registered Representative will not represent, directly or indirectly, that any sales or services other than securities business are provided by or through the Company.

The relationship of the Registered Representative to the Company is that of an independent contractor, and nothing contained herein shall be construed to create an employer and employee relationship. **The Registered Representative agrees and understands that he/she will be designated to a Jefferson Pilot Securities Corporation Office of Supervisory Jurisdiction (OSJ) and will be supervised by the OSJ, the Company, and those individuals designated and authorized by the Company. The OSJ shall perform and provide all supervisory compliance services as shall be necessary or appropriate in connection with the Registered Representative in such manner as shall be determined by the Company.**

### 2. Solicitations

The Registered Representative, subject to section #4 below, shall be permitted to exercise his/her own judgment as to whom to solicit and the time, place, and manner of solicitation, subject to the suitability of such solicitation. The Company, through its authorized principals and supervisors, reserves the right to accept or reject any or all business submitted to it by the Registered Representative. In all cases in which the question of credit for business, confirmation of orders, or compensation is not definitely stipulated herein, the decision of the Company shall be final. The Registered Representative agrees that, in connection with all solicitations, he/she will not take or recommend any action which he/she may have reason to believe is not in the best interest of each client or customer. The Registered Representative shall not make any untrue statement or misrepresentations, or omit any material facts concerning securities or securities transactions.

The Registered Representative shall pay all expenses in connection with conducting business as a Registered Representative and shall comply with all federal and state laws, ordinances, and regulations relating thereto. The Registered Representative shall make no solicitation for any securities until he/she has been duly registered under the applicable state and federal laws and has obtained any license or registration required by law and all such registrations are then in effect.

### 3. Client Documentation Procedures

The Registered Representative agrees to promptly report and remit all applications, orders, checks, drafts, or funds of any kind received from clients in accordance with Company procedures, without commingling same with the Registered Representative's personal or business funds. In the event of failure to do so, this Agreement, including all accrued and accruing commissions, may be immediately terminated at the discretion of the Company or designated supervisor. The Registered Representative further agrees to comply with all other procedures for the handling of applications, orders, and checks that may be established and amended by the Company from time to time.

3-02682

*71 Ex "X"*

## 4. Compliance with Rules, Regulations, and Statutes

The Registered Representative agrees to comply strictly with the rules of the National Association of Securities Dealers Regulation, Inc., the Acts administered by the Securities and Exchange Commission and regulations promulgated thereunder, and applicable statutes and regulations of the United States and the state or states in which the Registered Representative solicits applications and orders hereunder. The Registered Representative understands that failure to comply with such rules, regulations, or statutes may result in disciplinary action by the National Association of Securities Dealers Regulation, Inc., the Company, and/or any regulatory authorities having jurisdiction.

The Registered Representative acknowledges that the Company, its authorized and designated principals and supervisors, and regulatory authorities may audit the Registered Representative at any time to ensure compliance with applicable rules, regulations, and statutes. The Registered Representative agrees to cooperate fully in any such audit and to inform the Company of any audit or inquiry by any regulatory authority.

The Registered Representative agrees to comply with all procedures and rules contained in the Company's compliance manual, as amended, and any compliance guidelines issued by the Company from time to time.

## 5. Fees

The Registered Representative agrees to be responsible for and to pay all of the following fees to the Company:

1) The annual registered representative fee (if applicable).
2) All applicable state registration/licensing fees including renewal fees and applicable examination fees. The Company shall determine which state licensing and examination fees are applicable.
3) All ticket charges and other related charges pertaining to Pershing brokerage accounts.
4) Transaction and other administrative charges as established by the Company.

The above-mentioned fees may be modified at the discretion of the Company.

## 6. Outside Business Activities

The Registered Representative shall not engage in any outside business activity without the prior written notification to and approval from the Company. Outside business activity includes any business activity, whether or not securities-related, and whether or not compensation is received, which is outside the scope of the Registered Representative's relationship with the Company. Violation of this provision will be grounds for termination.

## 7. Selling Away

The Registered Representative agrees not to participate in any manner in any securities transaction other than those approved by the Company without the prior written consent of the Company. Violation of this provision will be grounds for termination.

## 8. Professional Liability Coverage

The Registered Representative shall obtain and maintain for the term of this Agreement errors and omissions insurance, in accordance with guidelines issued by the Company from time to time, and shall provide proof of such coverage to the Company.

## 9. Agreement Not Assignable

This Agreement and/or the commissions payable hereunder are not assignable without prior written approval of the Company.

## 10. Indemnification

The Registered Representative shall indemnify and hold the Company harmless against any claims, demands, suits, expenses (including reasonable attorney fees and expenses), losses or other forms of liability that arise out of or by reason of any act or failure to act by the Registered Representative which is or is alleged to be unauthorized, illegal, dishonest, improper, or in breach of this Agreement or the Compliance and Supervisory Procedures Manual in effect. This paragraph shall survive the termination of this Agreement.

## 11. Commissions

### a. Payment of Commissions

The Registered Representative shall be entitled to commissions, including trail commissions, with respect to all sales the Registered Representative shall make in accordance with the commission rate established by the OSJ Manager or Company designated supervisor. All commissions are credited subject to receipt by the Company of full payment of dealer concession for the services and products sold or other applicable compensation. Any commissions will be paid by the Company to the Registered Representative at the rate designated by the OSJ Manager, unless the OSJ Manager specifies in writing to the Company that commissions shall be paid directly by the Company to the OSJ Manager or any other designated supervisor or as otherwise required by law. The Registered Representative agrees that the Company fully satisfies its obligations to the Registered Representative pursuant to this agreement by paying commissions as instructed by the Registered Representative's OSJ Manager.

L-00131

Except as specifically excluded in this agreement, commissions will be paid on additional sales without any new solicitation of the investor as long as (i) the Registered Representative remains registered through the Company and is properly licensed, registered and appointed by the appropriate federal, state, and other governmental agencies, and product issuers as necessary, and (ii) the Registered Representative, in the judgment of the Company, has continued to give satisfactory services to such investor.

**b. Offset of Commissions**

The Company may in its sole discretion offset against any commissions or other monies accruing to the account of the Registered Representative any debts, liabilities, rights of indemnification arising under section #10 above, or other obligations of the Registered Representative (including charges and debits due from customers) due to the OSJ Manager, the Company, or any affiliate of the Company. The Company may also in its sole discretion offset against any commissions or other monies accruing to the account of the Registered Representative from any affiliate of the Company any debts or liabilities of the Registered Representative due to the OSJ Manager or the Company. Any indebtedness from the Registered Representative to the Company shall be a first lien upon any amount due the Registered Representative hereunder and may be collected by the Company at any time. The Company's right to offset and collect specified in this paragraph shall survive the termination of this Agreement.

**c. Vesting Upon Death, Disability, or Retirement**

If the Registered Representative either (i) dies, (ii) retires after attaining the age of fifty-five, or (iii) is permanently and totally disabled, and terminates his/her license with the National Association of Securities Dealers, Inc., the Company will continue to pay to the Registered Representative (or designated beneficiary upon death provided the Registered Representative has completed the appropriate beneficiary designation form) all commissions totaling in excess of $100 per annum, on business which was personally produced by the Registered Representative under and subject to the conditions and limitations set forth in this Agreement. If the Registered Representative is permanently and totally disabled, payment under this section may be made to the Registered Representative's legal guardian or attorney in fact. The Company is under no obligation to continue payment of any compensation if such payment would be in violation of any rule, regulation, or statute enacted by a government or regulatory authority, any selling agreement maintained by the Company, or the guidelines of any product issuer. The Registered Representative waives all commissions due him/her upon termination of this Agreement or if he/she obtains a securities registration through another entity.

Due to the servicing nature of investment advisory contracts, advisory related compensation is specifically excluded from the vesting provisions of this Agreement.

Modified retirement status may be agreed upon under separate written agreement between the Registered Representative and the Company.

**d. Account Statements**

The Company will provide the Registered Representative with an electronic statement, at least monthly, of the Registered Representative's account showing all earnings and payments made to his/her account, the balance due from the Company, and the amount of any indebtedness due from the Registered Representative to the Company. The Registered Representative agrees to notify the Company, in writing, within thirty (30) days after the date of such statement of any discrepancy or disagreement with such statement. In the absence of such notice, such statement shall be conclusively presumed to be correct unless the parties mutually agree to an adjustment.

**e. Transfer**

Upon approval and release by the current OSJ Manager, the Registered Representative may transfer to a new OSJ Manager and any commissions shall then be paid to the new OSJ Manager.

Upon approval and release of the OSJ Manager, the Registered Representative's customers and resulting customer accounts will be transferred with the Registered Representative to the new OSJ Manager.

## 12. Termination

This Agreement may be immediately terminated for cause by the Company. Cause is determined at the discretion of the Company and includes, but is not limited to, the violation of any provision of this Agreement, any securities regulations, Company policies or procedures, or any conduct detrimental to the Company's business or reputation.

This Agreement is automatically terminated upon (a) the death of the Registered Representative (except with respect to the vesting provisions outlined in Section 11(c), above), and may be immediately terminated by the Company upon the occurrence of any of the following: (i) the suspension, revocation, termination, or expiration of any license in force, whether or not such suspension, revocation, termination, or expiration is caused by an act or omission to act on the part of the Registered Representative; or (ii) the Registered Representative's failure to obtain and/or effect any additional licenses and/or registrations which might hereafter be required by the appropriate federal, state, and other governmental agencies in the jurisdictions in which the Registered Representative operates.

This Agreement may also be terminated by either the Registered Representative or the Company at any time upon written notice, specifying the date of termination and sent to the last-known address of the other party.

Upon termination the Registered Representative shall immediately cease all activities on behalf of the Company, shall no longer hold himself/herself out as a Registered Representative of the Company, and shall have no right to any compensation for transactions with trade dates after the date of termination. Commissions will be payable on transactions with trade dates on or prior to the date of termination, except that no payment will be made beginning thirty (30) days after the date of the Registered Representative's termination date, regardless of trade date of the transaction. Upon termination all clients will be assigned by the Company to the OSJ Manager, and the Registered Representative shall provide all client files and other securities files to the OSJ Manager, provided, however, that the Registered Representative may retain copies of such files.

### 13. Arbitration

In the event of any dispute, claim, question, or disagreement arising out of or relating to this Agreement or the breach thereof, the parties hereto shall use their best efforts to settle such dispute, claims, questions, or disagreement. To this effect, they shall consult and negotiate with each other in good faith and, recognizing their mutual interest, attempt to reach a just and equitable solution within a period of sixty (60) days. If not settled within sixty (60) days, the matter shall be settled by arbitration in accordance with the rules of the National Association of Securities Dealers Regulation, Inc.

### 14. Return of Materials

Upon termination of this Agreement, for any reason, the Registered Representative agrees to return to the Company all forms, manuals, stationery, and all other Company supplies which were provided by the Company or are the property of the Company.

The Registered Representative agrees to observe and abide by the rules and regulations of the Company, and any licensing agreements relating to any computer programs, manuals, tapes, disks, or other software provided to the Registered Representative or through the Company or its affiliates. Upon termination of this Agreement for any reason, the Registered Representative agrees to return to the Company all computer programs, manuals, tapes, disks or other software, and all client and office files.

### 15. Continuing Education

The Registered Representative shall comply with, and bear the cost for, all continuing education requirements required by the National Association of Securities Dealers Regulation, Inc. and the Company and other regulatory authorities in order to obtain and maintain his/her registrations and licenses. Failure to do so may result in withholding commissions or compensation earned by the Registered Representative, the imposition of fines and/or other penalties, or the termination of this Agreement.

### 16. Privacy & Confidentiality of Customer Information

The Registered Representative may receive non-public personal information about a customer. The Registered Representative agrees to abide by the Company's Privacy Practices Notice. The Registered Representative further agrees not to disclose this information to any third party not affiliated with the Company, except when such disclosure is authorized by the customer, necessary to effect or administer a transaction requested by the Company, or otherwise permitted by law.

### 17. Miscellaneous

The Agreement supersedes all previous agreements, oral or written, between the Registered Representative and the Company. This Agreement shall be governed by the laws of the State of New Hampshire.

IN WITNESS WHEREOF the parties hereto have executed this Agreement in duplicate as of the day and year first written above.

Registered Representative

Signature _____

Name _JACQUES C Tormay_

Date _8-28-02_

Jefferson Pilot Securities Corporation

Signature _____

Name _DAVID K BOOTH_

Title _VICE PRESIDENT_

Date _9/4/02_

3-02682

L-00129